**IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA AUGUSTA DIVISION**

| | | |
|---|---|---|
| IVAN BRYSON,<br><br>Plaintiff,<br><br>v.<br><br>CRYSTAL PAGE and AUGUSTA-RICHMOND COUNTY GEORGIA,<br><br>Defendants. | * * * * * * * * * * * | CV 125-128 |

**O R D E R**

Before the Court is Defendants Crystal Page and Augusta-Richmond County's ("Augusta") (collectively, "Defendants") motion for summary judgment. (Doc. 45.) For the following reasons, Defendants' motion is **GRANTED**.

## I. BACKGROUND

This case arises out of Plaintiff's treatment at Penfield Addiction Ministries ("Penfield"). (Doc. 45-1, at 3; Doc. 49-1, at 4.) On September 14, 2018, Plaintiff was arrested for driving under the influence and charged in the State Court of Richmond County, Georgia. (Doc. 45-1, at 2; Doc. 49-1, at 4.) In April 2021, Plaintiff agreed to participate in the Accountability Court program and had his case transferred to the Accountability Court Division. (Doc. 45-1, at 2-3; Doc. 49-1, at 4.) The

Accountability Court facilitated treatment for drug and alcohol offenders and allowed for reduced criminal sentences. (Doc. 45-1, at 1; Doc. 49-1, at 1.) As part of the Accountability Court program, Plaintiff had to abstain from alcohol and illegal drugs, comply with drug tests, and attend counseling. (Doc. 45-1, at 3; Doc. 49-1, at 4.) As the Coordinator for the Accountability Court, Defendant Crystal Page worked under Judge Watkins, Chief Judge of Richmond County State Court, and performed duties including oversight of participants, grant writing, and managing the court's budget. (Doc. 45-1, at 1-2; Doc. 49-1, at 2.) Plaintiff violated the conditions of this program, and Judge Watkins ordered him to complete an inpatient treatment program. (Doc. 45-1, at 3; Doc. 49-1, at 4.) On April 26, 2022, Plaintiff reported for a six-month rehabilitation program at Penfield, one of the Accountability Court's treatment providers, without knowing that it was a facility with a focus on Christian values.[1] (Doc. 45-1, at 2-3; Doc. 49-1, at 4.)

Plaintiff, who is Jewish, was forced to participate in Christian based activities during his treatment at Penfield. (Doc. 45-1, at 3; Doc. 49-1, at 4.) Plaintiff alleges that upon arriving to Penfield, he was asked questions such as "Have you been saved?" and "Have you given your life to Jesus?" (Doc. 1, at 3; Doc. 49-

[1] Plaintiff's complaint alleges he was told that his "only other option was to end his participation in Accountability Court and be sentenced for up to twelve months in jail." (Doc. 1, at 3.)

10, at 1.) Plaintiff was required to participate in Christian worship services; attend Bible study and worship activities that included Christian praise, singing, and a sermon; and complete weekly Christian reading and reflection assignments. (Doc. 1, at 3-4; Doc. 45-11, at 1-2; Doc. 49-11, at 2-4.)

On May 20, 2022, Plaintiff's wife, Stefanie Bryson emailed Defendant Page and informed her that Plaintiff was Jewish and being forced to participate in Christian based activities at Penfield.[2] (Doc. 45-1, at 3; Doc. 49-1, at 4.) Mrs. Bryson told Defendant Page that Plaintiff objected to treatment at Penfield. (Doc. 45-1, at 3; Doc. 49-1, at 4.) The Parties dispute whether Mrs. Bryson formally requested a transfer on Plaintiff's behalf in this email, and Defendants argue that a transfer was not requested at this time. (Doc. 45-1, at 4; Doc. 49-1, at 5.) In her email, she told Defendant Page about Plaintiff's Christian-based treatment and stated:

> [W]e would like to respectfully request that Judge Watkins please consider allowing him to come home with no further jail time. Whether that means he will have to terminate from the Accountability Court program or continue to participate, he just wants to come home.
>
> [Plaintiff] is not requesting to leave Penfield if it means he will serve any jail time, even if he cannot fully benefit from their approach to recovery.

(Doc. 45-10, at 4.) Mrs. Bryson also mentioned that Plaintiff's

[2] Defendant Page states this was the first time she learned that Plaintiff was Jewish. (Doc. 45-1, at 3; Doc. 45-15, at 25.)

drug test may have been an erroneous positive finding. (Id. at 3.) In her response, Defendant Page addressed Mrs. Bryson's concerns; stated she had thought Penfield did not require attendance at any religious services; expressed her intent to speak with Penfield's Director regarding this issue; and offered for Plaintiff to relocate to another residential treatment facility subject to the court's approval and his ability to pay for it. (Id. at 2-3.) Mrs. Bryson replied, asking Defendant Page not to contact Penfield's Director because it would "make things a lot worse for him." (Id. at 2.) Defendant Page assured that speaking to the Director would not make it worse for Plaintiff; she discussed these items upon entering into a contract with Penfield; and she would discuss these issues with Penfield "in fairness to their program." (Id. at 1-2.) Mrs. Bryson responded "To be clear, Penfield seems like a wonderful place and I am in no way stating otherwise." (Id. at 1.)

Defendant Page forwarded these concerns to Judge Watkins, the State Court Judicial Compliance Officer, and the Penfield staff. (Doc. 45-1, at 3; Doc. 49-1, at 4.) Defendant Page did not have authority to move Plaintiff from the program, and only Judge Watkins could move Plaintiff to a different treatment provider. (Doc. 45-1, at 3-4; Doc. 49-1, at 4.) On July 14, 2022, Plaintiff's attorney sent a letter to Defendant Page and requested a transfer to an alternative, secular treatment facility. (See Doc. 45-11,

at 1-4.) The Judicial Compliance Officer responded to the letter, and Plaintiff was transferred out of Penfield to an alternative program on July 22, 2022. (Doc. 45-1, at 4; Doc. 49-1, at 6.)

On April 15, 2024, Plaintiff filed suit against Defendants, alleging claims of a Religious Land Use and Institutionalized Persons Act ("RLUIPA") violation against Defendant Page in her official capacity and Defendant Augusta; First Amendment Establishment clause violation under 42 U.S.C. § 1983 against Defendant Page in her official capacity and Defendant Augusta; Free Exercise clause violation under § 1983 against Defendant Page in her official and individual capacities and Defendant Augusta; freedom of conscience under the Georgia Constitution against Defendant Page in her individual capacity; a violation of "Plaintiff's rights to his religions opinions" against Defendant Page in her individual capacity; and compensatory damages, punitive damages, and attorneys' fees. (Doc. 1, at 2-26.) On October 2, 2025, Defendants moved for summary judgment. (Doc. 45.) On November 10, 2025, Plaintiff responded. (Doc. 49.) On November 24, 2025, Defendant replied. (Doc. 51.) Plaintiff filed a sur-reply, and then Defendants responded. (Docs. 53, 54.) The motion is now ripe for the Court's review.

## II. LEGAL STANDARD

Summary judgment is appropriate only if "there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Facts are "material" if they could "affect the outcome of the suit under the governing [substantive] law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the non[-]moving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001). The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must "draw all justifiable inferences in [the non-moving party's] favor." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (citation, internal quotation marks, and internal punctuation omitted). The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.

The moving party has the initial burden of showing the Court, by reference to materials in the record, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the non-movant bears the burden of proof at trial, the movant has two options as to how it can carry its initial burden. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-16 (11th Cir. 1993). The movant may show an absence of evidence to support the nonmovant's case or

provide affirmative evidence demonstrating the nonmovant's inability to prove its case at trial. Id.

If the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Vaughn v. Ret. Sys. Of Ala., 856 F. App'x 787, 789 (11th Cir. 2021) (citation omitted). The non-movant must tailor its response to the method by which the movant carries its initial burden. Fitzpatrick, 2 F.3d at 1116-17. For example, if the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Id. at 1116. On the other hand, if the movant shows a lack of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17 (citations omitted). The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk of Court provided Plaintiff with notice of the motion for summary judgment, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 46.) For that reason, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985), have been satisfied.

## III. DISCUSSION

Defendants move for summary judgment on Plaintiff's claims, arguing that (1) the Eleventh Amendment bars Plaintiff's federal claims against Defendant Page in her official capacity; (2) judicial immunity bars Plaintiff's federal and state claims against Defendant Page in her official and individual capacities; (3) Plaintiff fails to establish a RLUIPA claim; (4) Plaintiff fails to establish a § 1983 claim; (5) Defendant Page is entitled to qualified immunity for Plaintiff's federal claims; (6) Plaintiff fails to state a claim under the Georgia Constitution; (7) Plaintiff fails to identify a cause of action in Count Five; (8) Sovereign Immunity bars Plaintiff's state law claims against Defendant Augusta; (9) Defendant Page is entitled to official immunity for state law claims in her individual capacity. (Doc. 45-2, at 2-14.) The Court addresses Defendants' arguments in turn.

**A. Eleventh Amendment Immunity**

Defendants move for summary judgment on Counts One, Two, and Three for Plaintiff's federal claims under RLUIPA and § 1983 against Defendant Page in her official capacity, arguing they are barred by the Eleventh Amendment. (Id. at 2.)

The Eleventh Amendment to the United States Constitution provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced, or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases have extended the Amendment's applicability to suits by citizens against their own States." Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). Such immunity also extends to agents and instrumentalities that act as "arms of the State" and "applies even when a state is not named as a party of record, if for all practical purposes the action is against the state." Kaimowitz v. The Fla. Bar, 996 F.2d 1151 (11th Cir. 1993) (citation omitted).

In determining whether an official is acting as an "arm of the State," the Court will weigh the four Manders factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its

funds; and (4) who is responsible for judgments against the entity." Manders v. Lee, 338 F.3d 1304, 1309 (11th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004). Further, whether a defendant was acting as an "'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id. at 1308. Thus, as to these claims under 42 U.S.C. § 1983, the Court must determine whether Defendant Page was acting as an "arm of the State" during Plaintiff's allegations. Id.

Defendants argue that as the former Coordinator of the Accountability Court for the State Court of Richmond County, Defendant Page was acting as an arm of the State of Georgia under the Manders factors and not on behalf of Augusta. (Doc. 45-2, at 3.) First, they argue that the State created the county state courts and authorized the Accountability Court divisions. (Id. (citing O.C.G.A. §§ 15-1-15, 15-1-18, 15-1-23).) Defendants argue that Defendant Page was an employee of Judge Watkins and not Augusta. (Id. at 3.) Second, they argue Defendant Page and the Accountability Court are subject to the authority of the State because the State created the Council of Accountability Court Judges ("CACJ"), which oversees the Accountability Court, provides training for the coordinator, and defines the coordinator's duties. (Id. (citing O.C.G.A § 15-1-18).) They argue the State had exclusive control over Defendant Page because she "worked in

the judicial branch and directly for Judge Watkins." (Id. at 3-4.) Third, Defendants argue the Accountability Court derives funds from state funds, county funds, grants, and donations, and so long as state funds are involved, then this factor supports Eleventh Amendment immunity. (Id. at 4.) Fourth, Defendants argue that Augusta has no obligation to satisfy any judgment against an elected official or employee whose conduct was not in violation of any law, so the Augusta Commission has no obligation to satisfy a judgment against Defendant Page. (Id.)

Plaintiff argues that the Manders factors are not applicable because Augusta employed Defendant Page and could discipline or fire her. (Doc. 49, at 1, 9-10.) Plaintiff argues that Augusta hired Defendant Page, received the grant funds, and contracted with Penfield for the treatment program. (Id. at 2-3.) Plaintiff cites to a Substance Abuse and Mental Health Services Administration ("SAMHSA") grant application, in which Defendant Page was the authorized representative for the "State Court of Richmond County Accountability Court," listed the applicant type as "County Government," and estimated no funding from the State. (Id. at 1-2; Doc. 49-5, at 3-4.) Plaintiff argues that Defendant Page's particular function here is the running of a probation drug treatment program, which is not a solely judicial or State function. (Doc. 49, at 4.) Plaintiff asserts Defendant Page's job description and obligations limit her "as the final authority

i[n] numerous areas of the drug treatment program," and "the [c]ourt has one power only - it sentences the probationer to the program and it can remove him from the program." (Id. at 5; Doc. 49-4, at 1-4; Doc. 49-5, at 8-9.)

In response, Defendants argue the SAMHSA grant application is not relevant, does not list Penfield as one of the funding recipients, clearly states the State Court of Richmond County Accountability Court is the applicant for the grant and not Augusta, and indicates Judge Watkins would develop court protocols and procedures. (Doc. 51, at 1.) Defendants also argue the job listing Plaintiff relies on was not from the year Judge Watkins hired Defendant Page and does not indicate that the position would be an Augusta Richmond-County employee. (Id. at 2.)

Plaintiff cites Owens v. Kelley to support his argument that Defendant Page's function was not solely judicial or that of the State. (Doc. 49, at 4 (citing 681 F.2d 1362 (11th Cir. 1982)).) Plaintiff argues that in Owens, the plaintiff sued a state judge, a county probation officer, a county employee, the Director of the Judicial Service Agency, and the county, and the Eleventh Circuit only found the judge had immunity. (Id.) Defendants argue the county defendants in Owens never asserted that they worked for the state judge, unlike Defendant Page. (Doc. 51, at 3.) Plaintiff argues that one defendant in Owens was "a non-judicial employee"

and another "occupied the same position as [Defendant] Page." (Doc. 53, at 2 n.2.)

Plaintiff also cites Grech v. Clayton Cnty. to support his position that the Manders factors do not apply. (Doc. 49, at 9 (citing 335 F.3d 1326 (11th Cir. 2003)).) In Grech, the Eleventh Circuit found the sheriff could not be held liable under 42 U.S.C. § 1983 because he was not a policymaker for the county or under the county's authority to control. 335 F.3d at 1348. Plaintiff argues that unlike the sheriff in Grech, Augusta has control over Defendant Page. (Doc. 49, at 9.) Based on the agreement between Augusta and Penfield for treatment services, Plaintiff argues Augusta had control over Defendant Page's duties, qualifications, and salary. (Id. at 9-10; Doc. 49-7, at 1-6.)

Although Plaintiff urges the Court not to apply the Manders factors "because Defendant Page and Defendant [Augusta] are not arms [of] the state," the Court must determine whether Defendant Page was acting as an arm of the state, and thus, must analyze the Manders factors. (Doc. 49, at 1); 338 F.3d at 1309.

1. How State Law Defines the Entity

Georgia law states that "any court that has jurisdiction over any criminal case which arises from the use . . . of a controlled substance, noncontrolled substance, dangerous drug, or other drug may establish a drug court division to provide an alternative to the traditional judicial system for disposition of such cases."

O.C.G.A. § 15-1-15(a)(1). Georgia law also provides for the court to assign such cases to the drug court division. § 15-1-15(a)(2). Georgia law also specifically states "the Council of Accountability Court Judges of Georgia ("CACJ") shall establish standards and practices for drug court divisions . . . relating to practices shown to reduce recidivism of offenders with drug abuse problems." § 15-1-15(a)(4)(A). The CACJ Rules and Regulations define the core team members for the Accountability Courts and list the "Coordinator" as the second highest team member of the DUI Court following the judge. (Doc. 45-3, at 55.)

The Court finds neither Georgia law nor the CACJ state that the Accountability Courts function on behalf of the requisite county. Further, the CACJ states that though it "may occasionally obtain grant funding from federal or other sources of funds, the vast majority of funds available through the Council comes from the state legislature." (Id. at 13.) Also, "[a]ll grant awards are reimbursement grants that utilize a court's county finance department as the fiscal agent for the grant." (Id. at 17.) Finally, the Georgia Constitution states that counties have no authority over state courts. GA. CONST. art. IX, § 2, ¶ I(c)(7).

The Court finds that Georgia law defines the Accountability Court as an entity of the state and "an alternative to the traditional judicial system" instead of a county entity. O.C.G.A. § 15-1-15(a)(1). Although Georgia law does not specifically

codify the Coordinator of the Accountability Court, there is otherwise no indication that an official of the Accountability Court would act on behalf of Augusta under Georgia law. Defendant Page stated that she worked for Judge Watkins and not for Augusta in her deposition and identified Judge Watkins as her supervisor with the power to hire and fire her. (Doc. 45-15, at 54-55.) Thus, the Court finds this factor weighs in favor of finding Defendant Page as an arm of the State.

2. Degree of Control the State Maintains over the Entity

The second factor examines the degree of control the State maintains over the entity. Manders, 338 F.3d at 1320. Judge Watkins was a state judge for the State Court of Richmond County and the Accountability Court. (Doc. 45-2, at 5.) Georgia law determines the qualifications of state judges, and the Georgia Constitution governs the discipline, removal, or involuntary retirement for a state judge. O.C.G.A. § 15-7-21; GA. CONST. art. VI, § 7, ¶ VII. As for the coordinator of the Accountability Court, this position is determined by the CACJ, which was established under Georgia law. O.C.G.A. § 15-1-18. Defendants submit the "DUI/Drug Court Standards" and "Rules and Regulations," which were issued by the CACJ, and both documents regulate the duties and responsibilities of the program coordinator pursuant to O.C.G.A. § 15-1-19. (Doc. 45-4, at 1, 10; Doc. 45-3.) As stated above, the Georgia Constitution states that counties have no

authority over state courts or court personnel. GA. CONST. art. IX, § 2, ¶ I(c)(7).

Beyond the statutory control over Accountability Courts, Eleventh Circuit law on Eleventh Amendment immunity states "being labeled as a 'county officer' is not determinative" regarding court clerks. Kicklighter v. McIntosh Cnty. Bd. of Comm'rs, 694 F. App'x 711, 715 (11th Cir. 2017) (citation omitted) (finding a superior court deputy clerk had Eleventh Amendment immunity because Georgia law set the qualifications and training, the Governor had authority to allege misconduct and incite removal, and Georgia law bars counties from taking actions affecting the clerk's office). Although Defendant Page was a coordinator for the Accountability Clerk and not a clerk, "[t]he constitutional and statutory framework of Georgia place superior court clerks within the realm of state officials for sovereign immunity purposes." Bullock v. Paris, No. 24-10674, 2024 WL 4717950, at *3 (11th Cir. Nov. 8, 2024) (quotations omitted). Further, "superior court clerks in Georgia constitute state officials based on how they are defined by state law, and based on the degree of control the state maintains over them." Id. (citing Manders, 338 F.3d at 1308) (applying Eleventh Amendment immunity to county employees including a superior court clerk).

Moreover, the evidence submitted further supports the State's control over the Accountability Court as opposed to Augusta.

Tameka Allen, an administrator for Augusta, stated "[Augusta] ha[s] no relationship" to the Accountability Court; the Accountability Court is "under the umbrella of the state court and state court judge;" and "the [A]ccountability [Court] works under, from what I understand, the state court judge." (Doc. 45-14, at 5-6.) Finally, Ms. Allen stated "[Augusta] does not play a role in what the [A]ccountability [C]ourt does as it relates to Penfield. It has never played [a] role in that process." (Id. at 15.) While Plaintiff argues Defendant Page initially stated her employer was "Augusta-Richmond County" at the beginning of her deposition, she also stated Judge Watkins was her supervisor, who she "directly report[s] to," who "has the authority to hire or fire [her], and who she "consider[ed] [] to be [her] employer." (Doc. 45-15, at 5, 54.) Plaintiff also argues "[Augusta] could certainly control [Defendant] Page by disciplining her o[r] firing her," but he fails to point to evidence to support this argument. (Doc. 49, at 9.) Instead, he cites the contract between Augusta and Penfield that establishes their agreement for treatment services, but this agreement is clearly governed, based on the letterhead, by the State Court of Richmond County and the State Court Accountability Courts. (Id.; Doc. 49-7, at 1.) Based on the above, the Court finds Defendant Page was subject to the authority of the state as the coordinator of the Accountability Court.

3. Where the Entity Derives Its Funds

The third factor analyzes where the Accountability Court derives its funds. Manders, 338 F.3d at 1323. Georgia law provides that the Accountability Court may receive funding for salaries, equipment, services, and supplies from federal grant, state, and county funds. O.C.G.A. §§ 15-1-15(a)(9), 15-1-19(a)(10). Georgia law specifies the CACJ is "authorized to accept and use gifts, grants, and donations" and such expenses shall be paid from state funds, federal funds, or other appropriate sources. § 15-1-18(e). Finally, Georgia law states that the state "Criminal Justice Coordinating Council shall establish a grant program for the provision of funds to accountability courts . . . to facilitate the implementation of trauma-informed treatment." § 15-1-23(b). After examining where the Accountability Court is authorized to receive its funds, the Court will turn to where Defendant Page received funds to establish the agreement with Penfield.

The Accountability Court received a federal grant from SAMHSA to contract treatment service providers and ultimately fund treatment of their participants at Penfield. (Doc. 45-1, at 2; Doc. 49-1, at 2.) To obtain approval for SAMHSA grants, Judge Watkins identified treatment providers and SAMHSA approved them and issued the grants. (Doc. 45-1, at 2; Doc. 49-1, at 2.) Plaintiff argues a Tracking Accountability in Government Grants

System ("TAGGS") spreadsheet from the Health and Human Services ("HHS") depicts funding to Augusta for the Accountability Court since 2018. (Doc. 49, at 3; Doc 49-8, at 1-2.) Plaintiff fails, however, to submit evidence that county or local government funds finance the Accountability Court. While acknowledging the SAMHSA grant was distributed to Augusta, Defendants contend "[t]he county simply acted as a fiscal agent to facilitate payments to Penfield," and Augusta had no authority over the funds. (Doc. 45-2, at 7; Doc. 49-8, at 2.) Further, Allen stated in her deposition that "any[]time there are grant funds that are provided through the city . . . it has to go through our bank account." (Doc. 45-14, at 14.) Though the SAMHSA grant was distributed first to Augusta, the Court nonetheless finds that the Accountability Court's funding came from federal SAMHSA grants and not county or local government funds. Thus, this factor weighs in favor of finding Defendant Page was an arm of the State.

4. Liability for and Payment of Adverse Judgments

Finally, the fourth factor is the source of funds that will pay any adverse judgment against Defendant Page in her official capacity. Manders, 338 F.3d at 1324. Defendants cite Augusta Code § 1-7-1 to support that Augusta has no obligation to satisfy any judgment against Defendant Page. Section 1-7-1 of the Augusta Code states "[t]he [Augusta] County Commission will pay any judgment rendered against a County employee when the Commission

feels that the employee was performing his duty as an [Augusta] employee." Augusta Code § 1-7-1. The Parties do not submit other evidence, and Georgia law does not specify, as to what entity is liable for adverse judgments against the Accountability Court or Defendant Page.

Should Plaintiff obtain an adverse judgment against the coordinator of the Accountability Court, the Court presumes the judgment would be paid out of the Accountability Court's budget, and not directly by the State or county. Manders, 338 F.3d at 1327 (holding that a judgment against a sheriff in his official capacity would be paid out of the sheriff's budget, which is comprised of state and county funds). Georgia law does not specify one entity to fund the Accountability Court's salaries, equipment, services, and supplies but states funding may be from the federal, state, or county funds. O.C.G.A. § 15-1-15(a)(9). As such, the Court cannot clearly decipher what entity is responsible for judgments against the Accountability Court or its coordinator. However, the Eleventh Circuit noted "when the fourth factor is the only one weighing against finding that the entity is an arm of the state, . . . the entity will, on balance, be entitled to Eleventh Amendment immunity. Kicklighter, 694 F. App'x at 715 (citation omitted). Accordingly, Defendant Page is entitled to Eleventh Amendment immunity.

Therefore, the Court finds that all federal claims against Defendant Page in her official capacity are barred under the Eleventh Amendment. Defendants' motion for summary judgment as to Counts One, Two, and Three against Defendant Page in her official capacity is **GRANTED**. The Court turns to the remaining claims against Defendant Page in her individual capacity and Defendant Augusta.

**B. Judicial Immunity**

Next, Defendants argue Plaintiff's claims against Defendant Page in her individual capacity are barred by judicial immunity because she worked directly for Judge Watkins. (Doc. 45-2, at 4-5.) Judges "are entitled to absolute judicial immunity from damages for those acts taken while they are acting in their judicial capacity." Williams v. Alabama, 425 F. App'x 824, 826 (11th Cir. 2011) (citation omitted). That absolute judicial immunity "applies even when [a] judge's acts are in error, malicious, or were in excess of his or her jurisdiction." Bolin v. Story, 225 F.3d 1234, 1239 (11th Cir. 2000) (citing Stump v. Sparkman, 435 U.S. 349, 356 (1978)). Absolute immunity also applies to claims made in an individual capacity. Stevens v. Osuna, 877 F.3d 1293, 1300-01 (11th Cir. 2017) (applying absolute

immunity where the plaintiff's claims were against the judge in his individual capacity).

> Whether a judge's actions were made while acting in his judicial capacity depends on whether: (1) the act complained of constituted a normal judicial function; (2) the events occurred in the judge's chambers or in open court; (3) the controversy involved a case pending before the judge; and (4) the confrontation arose immediately out of a visit to the judge in his judicial capacity.

Williams, 425 F. App'x at 826 (citations and quotations omitted). Judicial immunity also extends beyond judges. Caffey v. Ala. Sup. Ct., 469 F. App'x 748, 751 (11th Cir. 2012) (citation omitted). Non-judicial officials enjoy quasi-judicial immunity where their "official duties have an integral relationship with the judicial process." Id. (citation and quotation marks omitted). "Court clerks enjoy a narrower ambit of immunity than judges." Hyland v. Kolhage, 267 F. App'x 836, 842 (11th Cir. 2008) (citation and quotation marks omitted).

Defendants argue Judge Watkins presided over Plaintiff's criminal case, and Defendant Page worked directly for Judge Watkins and only performed duties that he assigned. (Doc. 45-2, at 5.) Defendants argue "[Defendant] Page's actions were clearly judicial in nature and an extension of the court" because Plaintiff only dealt with her "as part of his criminal case in the State Court and Accountability Court." (Id.) Thus, they argue any alleged

actions of Defendant Page were at the discretion of Judge Watkins and thus, were judicial acts protected by judicial immunity. (Id.)

Plaintiff argues Defendants waived judicial immunity by failing to assert it in their responsive pleading, and Defendant Page would not be entitled to judicial immunity regardless because she is not an employee of Judge Watkins. (Doc. 49, at 10-11.) Plaintiff argues Defendant Page "was an employee of the county, had duties independent of Judge Watkins, and duties imposed upon her by the SAMHSA agreement she signed." (Id. at 12.) Further, Plaintiff argues the action of assigning him to a drug rehabilitation program was protected by judicial immunity but the "assignment to a Christian-based program" is not protected. (Id.)

The Court finds that Defendant Page failed to raise the affirmative defense for judicial immunity in her answer. (Doc. 10, at 1.) Under Federal Rule of Civil Procedure 8(c), "[i]n responding to a pleading, a party must affirmatively state any avoidance or affirmative defense." FED. R. CIV. P. 8(c). "[A] failure to plead judicial immunity waived the affirmative defense." Mordkofsky v. Calabresi, 159 F. App'x 938, 939 (11th Cir. 2005); Moreland v. Wood, No. CV 214-143, 2015 WL 1799898, at *8 (S.D. Ga. Apr. 16, 2015) ("judicial immunity . . . is an affirmative defense subject to waiver"). Here, the Court finds Defendant Page waived judicial immunity as an affirmative defense.

**C. Count One: RLUIPA**

Next, Defendants argue Plaintiff fails to establish a claim under RLUIPA, which remains pending only against Augusta.[3] (Doc. 45-2, at 6-10.) RLUIPA, 42 U.S.C. § 2000cc, *et seq.*, requires the government to justify substantial burdens on religious practice by a "compelling, rather than merely a legitimate, governmental interest." Smith v. Allen, 502 F.3d 1255, 1266 (11th. Cir 2007), *abrogated on other grounds by* Sossamon v. Texas, 563 U.S. 277, 286 (2011) and *overruled on other grounds by* Hoever v. Marks, 993 F.3d 1353, 1363-64 (11th Cir. 2021) (en banc) (citation omitted). RLUIPA states:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). Thus, an individual must have been "residing in or confined to" a covered "institution," which includes "any facility or institution" that is "a jail, prison, or other correctional facility [or] a pretrial detention facility." Id.; 42 U.S.C. § 1997(1). A plaintiff must demonstrate "1) that

[3] Because the Court found Defendant Page was immune in her official capacity and Plaintiff did not bring his RILUPA claim against Defendant Page in her individual capacity, the Court only analyzes Plaintiff's free exercise claim against Defendant Augusta. (Doc. 1, at 2, 17.)

he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened" to succeed on his RLUIPA claim. Smith, 502 F.3d at 1276 (citation omitted). A "religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). A "substantial burden" is a "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." Smith, 502 F.3d at 1277 (citation omitted). This pressure "must be 'more than . . . incidental' and 'must place more than an inconvenience on religious exercise.'" Id. (citation omitted).

Defendants argue RLUIPA does not apply to Plaintiff's claim, and Plaintiff cannot show Defendants substantially burdened his religious exercise. (Doc. 45-2, at 6-8.) First, they argue RLUIPA is only applicable to persons confined in an institution which provides services on behalf of the government, like a correctional facility. (Id. at 6.) Defendants argue Plaintiff was not forced to attend Penfield, and despite Plaintiff's allegation, Penfield is not a correctional facility, so it is not an institution under RLUIPA. (Id. at 6-7.) Defendants also argue Plaintiff fails to show how Augusta burdened his religion because his evidence focuses on the actions of Penfield's employees. (Id. at 7.) Defendants argue Augusta did not violate RLUIPA by providing funds to Penfield because the SAMHSA grant was not from Augusta. (Id.) Finally,

Defendants argue Augusta did not burden Plaintiff's religion because Plaintiff himself chose to enter the Accountability Court program and he selected Penfield following Judge Watkins' order for inpatient treatment. (Id. at 7-8.)

Under RLUIPA, Plaintiff argues the term "correctional facility" is broad and applies to the Accountability Court because Plaintiff was forced to participate in this program as a condition of bond. (Doc. 49, at 15.) Plaintiff quotes the Accountability Court DUI Program Agreement: "You are being placed in the DUI program pursuant to a sentence of the Court and will be continued in such program provided you comply with the terms and conditions of the Agreement." (Id. (citing Doc. 45-7, at 1.) Plaintiff relies on Khatib v. Cnty. of Orange, which held a courthouse holding facility fell within the definition of a "pretrial detention facility," "jail," and thus, an institution under RLUIPA. (Id. (citing 639 F.3d 898, 902 (9th Cir. 2011)).)

Defendants distinguish Khatib from the facts at hand because "Plaintiff was not confined in a secure detention facility. He was in a rehabilitation center, and he could leave and voluntarily terminate his participation in the Accountability Court." (Doc. 51, at 7.) They argue Plaintiff was initially only required to seek outpatient treatment. (Id.) Thus, Defendants argue Plaintiff has failed to show he was in jail, prison, or a correctional facility within the definition of RLUIPA. (Id.)

The Court finds the evidence does not support that Penfield was a jail, prison, or correctional facility under RLUIPA based on the Accountability Court DUI program and nature of the facility. 42 U.S.C. § 2000cc-1(a); 42 U.S.C. § 1997. As referenced in RLUIPA, the plain meaning of the word "correctional facility," refers to a prison. See Correctional Facility, Merriam Webster, https://www.merriamwebster.com/dictionary/correctionalfacility (last visited August 21, 2026) ("a place where people are kept when they have been arrested and are being punished for a crime"); Correctional Institution, Black's Law Dictionary ("See PRISONS") (12th ed. 2024). Although few courts have addressed this issue, courts generally have declined to apply RLUIPA in facilities beyond jails, prisons, or pretrial detention facilities.[4] Plaintiff relies on Khatib from the Ninth Circuit, but those facts are materially different because the plaintiff in Khatib was confined in a holding facility at a courthouse. 639 F.3d at 901. Here, Plaintiff underwent treatment at a rehabilitation center following an alcohol offense as part of the Accountability Court program.

[4] Stein v. Howell, 3:24-CV-166, 2026 WL 538416 (S.D. Ohio Feb. 26, 2026) ("The few courts to address this issue have found that restriction or supervision of an individual who is not located in a physical facility cannot sustain a RLUIPA claim."); Afflick v. New York, 25-CV-7872, 2026 WL 458131 (S.D.N.Y. Feb. 17, 2026) (finding RLUIPA did not apply because Plaintiff's residence was unknown but he was not incarcerated or in pretrial detention and alleged a residential address); Robinson v. Pennsylvania, 2:25-CV-01644, 2025 WL 1558470, at *2 (E.D. Pa. June 2, 2025) (finding RLUIPA does not provide plaintiff a remedy where he was not residing in an institution but living in the community); Shash v. City of Pueblo, 770 F. Supp. 3d 1279, 1297-98 (D. Colo. 2025) (dismissing RLUIPA claims where the plaintiff was in police custody at a hospital but not a pretrial detention facility).

Plaintiff otherwise fails to provide case law supporting that RLUIPA applies to a plaintiff residing at a rehabilitation center as part of an optional court program. The Court refrains from broadening the meaning of an institution under RLUIPA.

Further, Penfield did not function as a correctional facility. It is undisputed that the Accountability Court provides "treatment for drug and alcohol offenders" and an opportunity "for modified or reduced criminal sentences." (Doc. 45-1, at 1; Doc. 49-1, at 1.) As such, the Accountability Court functions as an alternative to a jail or prison that is focused on treatment and rehabilitation with the possibility of a sentence reduction. Also, Defendant Page stated in her deposition that Plaintiff was a "participant" in the Accountability Court program as opposed to an "inmate." (Doc. 45-15, at 32.)

Moreover, both Parties rely on the Accountability Court DUI Program Agreement. (Doc. 49, at 15; Doc. 51, at 6-7; Doc. 45-7, at 1-2.) At the bottom of the agreement, it states "[a]ny person wishing to voluntarily terminate from the DUI Court Program must notify the Accountability Court Coordinator." (Doc. 45-7, at 2.) As Defendants argue, Plaintiff could have voluntarily terminated his participation and "returned to the sentencing Court for the appropriate action." (Id. at 1.) Thus, the Court finds Plaintiff was not "confined" to Penfield as one would be to a prison. Further, the Agreement requires "a counseling program as approved

by the Court" without specifying whether it is an inpatient or outpatient program so long as "the treatment provider or Accountability Court Personnel [may] visit [Plaintiff] in [his] home or elsewhere." (Id.) Based on this description, Plaintiff's participation in the Accountability Court and treatment at Penfield was voluntary and not a condition of his criminal sentence. Thus, the Court finds Penfield is not an institution under RLUIPA. Cutter v. Wilkinson, 544 U.S. 709, 720-21 (2005) ("[RLUIPA] covers state-run institutions - mental hospitals, prisons, and the like - in which the government exerts a degree of control unparalleled in civilian society and severely disabling to private religious exercise."). Based on the above, the Court finds there is no genuine issue of material fact that Plaintiff was confined in an institution as required by RLUIPA, and Defendants' motion for summary judgment as to the RLUIPA claim is **GRANTED**.

**D. Count Two: Establishment Clause**

Defendants argue Plaintiff fails to establish a § 1983 claim because any actions by Defendant Augusta did not violate the Establishment Clause.[5] (Doc. 45-2, at 9-10.) The Establishment Clause of the First Amendment states, "Congress shall make no law respecting an establishment of religion." U.S. CONST. Amend. I.

[5] Again, the Court found Defendant Page was immune in her official capacity and Plaintiff did not bring his Establishment Clause claim against Defendant Page in her individual capacity, so the Court only analyzes this claim against Defendant Augusta. (Doc. 1, at 17.)

This restriction applies to states, "as well as state-created entities and their employees, through the Due Process Clause of the Fourteenth Amendment." Holloman v. Harland, 370 F.3d 1252, 1284 (11th Cir. 2004) (citing Cantwell v. Connecticut, 310 U.S. 296, 303 (1940)). The Supreme Court "instructed that the Establishment Clause must be interpreted by reference to historical practices and understandings." Kennedy v. Bremerton Sch. Dist., 597 U.S. 507, 535 (2022) (quotations and citation omitted). To determine whether Defendants' actions violated the Establishment Clause, the Court will "look to the record of evidence showing the progression leading up to" assigning Plaintiff to Penfield for treatment. McCreary Cnty. v. Am. Civ. Liberties Union of Ky., 545 U.S. 844, 868 (2005).

First, Defendants argue "[h]istorically, government funds may be given to religious institutions for a secular purpose." (Doc. 45-2, at 9 (citing Lemon v. Kurtzman, 403 U.S. 602, 624 (1971)).) They further argue "[a] neutral benefit program where public funds flow to religious organizations through independent choices of private recipients does not offend the Establishment clause." (Id. (citing Carson v. Makin, 596 U.S. 767, 781 (2022)).) Defendants acknowledge that Augusta sent payments to Penfield from the Accountability Court's SAMHSA grant for the secular purpose of reducing incarceration rates and providing treatment for drug and alcohol offenders. (Id. at 9-10.) However, they argue such

actions do not violate the Establishment clause because Plaintiff had a choice of treatment facility and was approved to complete treatment at a different facility when he requested to be moved. (Id. at 10.) Although Plaintiff argues Defendant Page was responsible for choosing Penfield and knew it was "Christ-centered," he fails to argue how Augusta violated his First Amendment rights. (Doc. 49, at 14.) Plaintiff also argues "the contract between Defendant Augusta and Penfield" makes "no mention of any secular alternative." (Id.)

Here, the Court finds Plaintiff failed to show a genuine dispute of material fact that Defendant Augusta violated the Establishment Clause. First, the Court interprets whether the Establishment Clause was violated based on "reference to historical practices and understandings." Kennedy, 597 U.S. at 535 (citation omitted). The purpose of funding Penfield's agreement with the Accountability Court was "for the services of Treatment Provider/Sober Living Program," and this agreement makes no mention of a religious purpose. (Doc. 49-7, at 1.) Thus, the Court finds the funds were given for a secular purpose. Wallace v. Jaffree, 472 U.S. 38, 56 (1985) (citations omitted) ("the First Amendment requires that a statute must be invalidated if it is entirely motivated by a purpose to advance religion"). While "the Court often does accept governmental statements of purpose, in keeping with the respect owed in the first instance to such

official claims," there are "unusual cases where the claim was an apparent sham." McCreary, 545 U.S. at 865. The Court does not find this to be one of those unusual cases. Thus, Defendants' motion for summary judgment as to Plaintiff's Establishment claim under § 1983 against Augusta is **GRANTED**.

**E. Count Three: Free Exercise Clause**

Next, Defendants argue Plaintiff failed to prove 42 U.S.C. § 1983 claims against Augusta and Defendant Page in her individual capacity under the Free Exercise Clause of the First Amendment.[6] (Doc. 45-2, at 8.) A county may be liable under § 1983 only when it is "actually responsible" for a constitutional violation. Grech, 335 F.3d at 1329 (citation omitted). To show a county is actually responsible, the plaintiff must "identify a municipal policy or custom that caused his injury." Id. (alteration adopted and citation and internal quotation marks omitted). Two methods exist by which to establish a county policy: the plaintiff may "identify either (1) an officially promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the county." Id. (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690-91 (1978); Brown v. Neumann, 188 F.3d 1289, 1290 (11th Cir. 1999)). "[I]n doing so, the [p]laintiff must show that the

[6] Count Three for a violation of the Free Exercise clause only remains against Defendant Augusta and Defendant Page in her individual capacity. (Doc. 1, at 19.)

county has authority and responsibility over the governmental function [at] issue." Temple v. McIntosh Cnty., No. 2:18-CV-91, 2019 WL 287482, at *3 (S.D. Ga. Jan. 22, 2019) (citing Grech, 335 F.3d at 1330) (quotations omitted).

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. Under the Free Exercise Clause, the plaintiff must show his religious exercise was substantially burdened. See Wilkinson v. GEO Grp., Inc., 617 F. App'x 915, 917 (11th Cir. 2015) ("To establish a violation of his right to free exercise, [Plaintiff] must first establish that a state actor imposed a 'substantial burden' on his practice of religion." (citation omitted)); 42 U.S.C. § 2000cc-1. As stated above, a "substantial burden" is a "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." Smith, 502 F.3d at 1277 (internal quotations and citation omitted). This includes "pressure that tends to force adherents to forego religious precepts or . . . that mandates religious conduct." Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 (11th Cir. 2004).

Defendants argue Augusta cannot be responsible under § 1983 because Plaintiff fails to point to an official county policy that caused a constitutional violation. (Doc. 45-2, at 8.) Instead, they argue Plaintiff merely alleges that Augusta received and used

SAMHSA grant funds to pay for treatment at Penfield through the Accountability Court, which is not unconstitutional. (Id. at 8-9.) Defendants further argue that Augusta cannot be liable for Accountability Court personnel that they have no authority to control. (Id. at 9 (citing GA. CONST. art. IX, § 2, ¶ I(c)(7).) As to the Free Exercise claim, Defendants argue Plaintiff failed to show Defendants substantially burdened his religious beliefs pursuant to a policy that is not neutral or generally applicable. (Id. at 10.) Defendants argue Defendant Page did not commit any act to substantially burden Plaintiff because Judge Watkins ordered him to undergo treatment at Penfield. (Id. at 9.)

Plaintiff argues Defendant Page violated the First Amendment by choosing Penfield for Plaintiff despite the program advertising itself as a "Christ-centered Integrative treatment" program with a vague secular alternative. (Doc. 49, at 14.) Plaintiff further argues Defendant Page ignored complaints from Plaintiff and his wife about being subjected to Christian beliefs because she thought they were making it up. (Id.) Plaintiff cites Owens in support of his argument that Defendants assigned Plaintiff to Penfield in violation of his First Amendment. (Id. (citing 681 F.2d at 1365-66 ("We recognize that there is a fine line between rehabilitation efforts which encourage lawful conduct by an appeal to morality and the benefits of moral conduct to the life of the probationer, and efforts which encourage lawfulness through adherence to

religious belief. Nevertheless, this is the line that must not be overstepped.").)

Defendants argue that Defendant Page did not violate the First Amendment because she did not assign Plaintiff to Penfield, had no authority to transfer Plaintiff, and did not ignore complaints from Plaintiff's wife. (Doc. 51, at 4.) Instead, Defendant Page alerted Judge Watkins to the email from Plaintiff's wife and the letter from Plaintiff's attorney, so none of her actions establish a First Amendment claim. (Id.) Defendants distinguish the Owens case because the "court simply explained how [the county] could be liable for the alleged First Amendment violation, but Plaintiff here fails to explain how [Defendant] Page could be liable for Judge Watkin[s'] alleged actions." (Id. at 6.) In Owens, the treatment program was administered and funded pursuant to county policy, and Defendants argue Defendant Page did not order Plaintiff to seek treatment at Penfield, did not fund Plaintiff's treatment, and is not a county government employee. (Id. (citing 681 F.2d, at 1370 n.20).)

Defendants also argue that Plaintiff fails to address their § 1983 arguments as to Augusta and thus concedes that he fails to state a § 1983 claim. (Id. at 10.) Defendants also argue that Plaintiff cannot attempt to hold Augusta liable for Defendant Page's actions because she was not a county employee and worked for Judge Watkins and the Accountability Court. (Id.) Plaintiff

argues that "if [he] objected[,] he was entitled to be transferred out." (Doc. 53, at 2.) Defendants argue Plaintiff lacks evidence that Defendant Page herself violated the First Amendment, and Plaintiff was ordered to seek treatment at Penfield in a court proceeding and not by Defendant Page. (Doc. 54, at 3; Doc. 49-11, at 2.)

The Court finds Plaintiff fails to show Augusta had control over his treatment at Penfield. As noted above, the Georgia Constitution states that counties have no authority over state courts. GA. CONST. art. IX, § 2, ¶ I(c)(7). Further, Defendant Page stated that Judge Watkins assigned Plaintiff to the Accountability Court, ordered him to seek treatment, and had final authority regarding his treatment provider. (Doc. 45-15, at 20; see Docs. 45-8; 45-9.) Defendant Page also testified that there were other free facilities that Plaintiff could have transferred to once he requested to leave Penfield. (Doc. 45-15, at 20-21.) Therefore, because Augusta has no authority over the policies of Judge Watkins or the State Court, Plaintiff cannot establish Augusta violated his rights under the Free Exercise Clause.

The Court also finds Plaintiff failed to prove his Free Exercise claim against Defendant Page. Defendant Page testified that she, along with Judge Watkins, met with the director of Penfield before including them in the Accountability Court grant and understood that Penfield residents were not required to attend

any religious services. (Id. at 51-52.) After Plaintiff started treatment at Penfield, Defendant Page testified that only Judge Watkins had the authority to move Plaintiff. (Id. at 55.) Thus, not only did Defendant Page lack authority to move Plaintiff upon his initial request, but she was also unaware that Penfield would impose religious programing. As such, the Court finds that Defendant Page, in her individual capacity, did not substantially burden Plaintiff's practice of religion. Based on the foregoing, Defendants' motion for summary judgment as to Plaintiff's free exercise claim under § 1983 against Defendant Augusta and Defendant Page in her individual capacity is **GRANTED**.

**F. Count Four: Freedom of Conscience**

Defendants argue Plaintiff fails to state a claim under the Georgia Constitution for freedom of conscience against Defendant Page in her individual capacity. (Doc. 45-2, at 11.) Defendants argue there is no private right of action for an alleged violation under the Georgia Constitution. (Id. (citing Lange v. Houston Cnty., 499 F. Supp. 3d 1258, 1281 (M.D. Ga. 2020)).) Plaintiff argues that the Georgia Constitution provides such a claim. (Doc. 49, at 16.)

Based on the authority, the Court finds Plaintiff lacks a private cause of action to bring this claim under the Georgia Constitution. See Howard v. Miller, 476 S.E.2d 636, 639 (Ga. Ct. App. 1996) ("[Georgia has] no equivalent to 42 U.S.C. § 1983, which

gives a claim against a state officer individually for certain unconstitutional acts."). Here, Plaintiff alleges that Defendant Page acted with deliberate intention to violate his rights to freedom of conscience under GA. CONST. art. I § I ¶ III. (Doc. 1, at 21.) However, there is no basis for such a claim under the Georgia Constitution; thus, Defendants' motion for summary judgment as to Plaintiff's freedom of conscience claim is **GRANTED**.

**G. Counts Five and Six**

Defendant argues Count Five fails to identify a law or statute that authorizes the claim. (Doc. 45-2, at 12.) Defendant also argues Count Six is barred by sovereign immunity and Plaintiff's failure to provide proof of an ante litem notice. (Id.)

Counts Five and Six appear to be state law claims, but Plaintiff fails to provide a statute or law under which they are based. In Count Five, which remains solely against Defendant Page in her individual capacity, Plaintiff alleged that "Each Defendant acted with a deliberate intention to cause injury to Plaintiff. Their actions were intentionally taken with actual malice or corruption." (Doc. 1, at 23.) Further, Plaintiff alleged that "[e]ach Defendant . . . showed willful misconduct wantonness, oppression or that entire want of care which raises the presumption of conscious indifference to consequence." (Id. at 23-24.) Based on Plaintiff's allegations, the Court finds no clear cause of action identified. Further, Plaintiff failed to argue or prove

such "deliberate intention to cause injury" with "actual malice or corruption." Therefore, Defendant Page is entitled to summary judgment on Count Five.

Count Six is brought against Defendant Augusta, and the Court finds sovereign immunities applies. Pursuant to the Georgia Constitution, "sovereign immunity extends to the state and all of its departments and agencies." GA. CONST. art. I, § II, ¶ IX (e). This sovereign immunity also protects counties. See Gilbert v. Richardson, 452 S.E.2d 476, 479 (Ga. 1994) ("[S]overeign immunity extends to counties under the 1991 amendment."). Furthermore, Georgia law provides that "[a] county is not liable to suit for any cause of action unless made so by statute." O.C.G.A. § 36-1-4. The burden is on the plaintiff to identify a waiver of sovereign immunity. Coosa Valley Tech. Coll. v. W., 682 S.E.2d 187, 190 (Ga. Ct. App. 2009). Here, it is unclear which allegations Plaintiff directs at Defendant Augusta. (Doc. 1, at 24-26.) Regardless, Plaintiff points to no statute that waives Defendant Augusta's sovereign immunity and states he has "not sued [Augusta] under state law." (Doc. 49, at 16.) Nonetheless, sovereign immunity applies to Defendant Augusta. As such, the Court finds Count Six fails. Thus, Defendants' motion for summary judgment as to Counts Five and Six is **GRANTED**. Because the Court has found Plaintiff failed to prove Counts One through Six against

Defendants, the Court need not evaluate the Parties' remaining arguments.

## IV. CONCLUSION

Based on the foregoing, **IT IS HEREBY ORDERED** that Defendants' motion for summary judgment (Doc. 45) is **GRANTED.** The Clerk is **DIRECTED** to **ENTER JUDGMENT** in favor of Defendants, **TERMINATE** all pending motions, and **CLOSE** this case.

**ORDER ENTERED** at Augusta, Georgia, this 17th day of September, 2026.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA